*14- 3107-TURNOFF*

SC:JMK/WMP
F. #2013R00505

# CR 14 - 00476

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ROBERT BANDFIELD,
    also known as "Bob Bandfield,"
ANDREW GODFREY,
KELVIN LEACH,
ROHN KNOWLES,
BRIAN DE WIT,
CEM CAN,
    also known as "Jim Can,"
IPC MANAGEMENT SERVICES, LLC,
IPC CORPORATE SERVICES INC.,
IPC CORPORATE SERVICES LLC,
TITAN INTERNATIONAL SECURITIES INC.,
LEGACY GLOBAL MARKETS S.A. and
UNICORN INTERNATIONAL SECURITIES LLC,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>I N D I C T M E N T</u>

Cr. No. _____

(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 1956(h) and 3551 et seq.,
T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

GLASSER, J.

AZRACK, M.J.

THE GRAND JURY CHARGES:

## INTRODUCTION

    At all times relevant to this Indictment, unless otherwise indicated:

I.   <u>Background</u>

    A.   <u>The Corporate Defendants</u>

        1.   The defendant IPC MANAGEMENT SERVICES, LLC was a Nevada limited liability company with its principal place of business in Belize City, Belize, and a mailing address in Clackamas, Oregon.  The defendant IPC CORPORATE SERVICES INC. was a Belize

1

corporation with its principal place of business in Belize City, Belize, and an office in St. Vincent, West Indies. The defendant IPC CORPORATE SERVICES LLC was a Nevis, West Indies, limited liability company with its principal place of business in Belize City, Belize, and mailing addresses in Clackmas, Oregon, and Nevis, West Indies. IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC. and IPC CORPORATE SERVICES LLC (collectively, "IPC CORP") were offshore management companies that marketed themselves on their website as providing, inter alia, the following services: (a) offshore company formation; (b) nominee services; (c) trust formation; (d) licensed trustee services; (e) full banking services; (f) offshore credit cards; and (g) offshore brokerage (securities) accounts.

      2.     The defendant TITAN INTERNATIONAL SECURITIES INC. ("TITAN") was an offshore broker-dealer and investment management company with its principal place of business in Belize City, Belize. TITAN marketed itself on its website as a fully licensed broker-dealer, regulated by the International Financial Services Commission ("IFSC") of Belize, which serviced, inter alia, the Over-the-Counter ("OTC") markets for both corporate and individual clients. TITAN emphasized that it considered client confidentiality paramount and adhered to Belize's strict privacy laws.

      3.     The defendant LEGACY GLOBAL MARKETS S.A. ("LEGACY") was an offshore broker-dealer and investment management company with its principal place of business in Panama City, Panama, and an office in Belize City, Belize. LEGACY marketed itself on its website as a fully licensed broker-dealer, regulated by the IFSC of Belize, which provided investors with full access to the major global exchanges worldwide from a single investment account. LEGACY emphasized that its management consisted of seasoned executives who had extensive experience in the offshore financial industry and distinguished backgrounds ranging

from top-performing financial advisors to experts in banking, public policy, securities law and regulatory compliance.

4.    The defendant UNICORN INTERNATIONAL SECURITIES LLC ("UNICORN") was an offshore broker-dealer and investment management company with its principal place of business in Belize City, Belize.  UNICORN marketed itself on its website as a fully licensed broker-dealer, regulated by the IFSC of Belize, which provided investors with full access to the major global exchanges worldwide from a single investment account.  UNICORN emphasized that its clients could "trade with confidence" because, inter alia: (a) information about beneficial owners, shareholders, directors and officers is not filed with the Belize government and not available to the public; (b) Belize does not disclose banking and financial information to the United States, or any other foreign government, for any reason, including for cases involving tax-related issues; (c) no government approvals are required for the transfer of dividends, interest and royalties, and for the repatriation of capital; and (d) it provided online brokerage features, including order routing to different market makers and 24-hour access to cash and securities transactions.

B.    The Individual Defendants

5.    The defendant ROBERT BANDFIELD, also known as "Bob Bandfield," a U.S. citizen, founded and controlled IPC CORP.  BANDFIELD worked at IPC CORP's office in Belize City, Belize.  BANDFIELD also claimed to have created TITAN, LEGACY and UNICORN.

6.    The defendant ANDREW GODFREY, a citizen of Belize, was employed by IPC CORP and worked at IPC CORP's office in Belize City, Belize.  GODFREY was the primary contact at IPC CORP for its clients.

7.    The defendant KELVIN LEACH, a citizen of the Bahamas, was the President of TITAN.  LEACH worked at TITAN's office in Belize City, Belize.

8.    The defendant ROHN KNOWLES, a citizen of the Bahamas, was employed by TITAN as the Head Securities Trader.  KNOWLES worked at TITAN's office in Belize City, Belize.

9.    The defendant BRIAN DE WIT, a citizen of Canada, was the President of LEGACY.  DE WIT worked at LEGACY's offices in Panama City, Panama.

10.    The defendant CEM CAN, also known as "Jim Can," a citizen of Canada, was the President of UNICORN.  CAN worked at UNICORN's office in Belize City, Belize.

II.    <u>Relevant Regulatory Principles and Definitions</u>

11.    The Foreign Account Tax Compliance Act ("FATCA") was a federal law enacted in March 2010 that targeted tax non-compliance by U.S. taxpayers with foreign accounts. FATCA required U.S. persons to report their foreign financial accounts and offshore assets. Additionally, FATCA required foreign financial institutions to report to the Internal Revenue Service ("IRS") certain financial information about accounts held by U.S. taxpayers or foreign entities in which U.S. taxpayers held a substantial ownership interest.

12.    An international business corporation ("IBC") was an offshore, untaxed company, formed under the laws of a foreign jurisdiction, which was not permitted to engage in business within the jurisdiction in which it was incorporated.  An owner of an IBC could deposit money and transfer stock to an IBC to facilitate banking and securities trading activities while maintaining a level of anonymity for the IBC's true owner because an IBC's ownership records were typically not publicly available.

13.   The term "beneficial owner" was defined under the rules of the U.S. Securities and Exchange Commission ("SEC").  It included any person who directly or indirectly shared voting power or investment power (the power to sell a security).  When a person or group of persons acquired beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Securities Exchange Act of 1934, they were required to file a Schedule 13D with the SEC.  Schedule 13D reported the acquisition and other information within ten days after the purchase. The schedule was filed with the SEC and was provided to the company that issued the securities and each exchange on which the security was traded.  Any material changes in the facts contained in the schedule required a prompt amendment.

14.   The term "nominee" in the securities fraud context referred to a person or firm into whose name securities or other properties were transferred in order to facilitate transactions, while concealing the customer as the actual owner.  A "nominee account" was a type of account in which a stockbroker held shares belonging to clients in the name of a sham entity or another individual.  The use of nominees and nominee accounts was designed to conceal the true ownership interest of the customer.

15.   "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which have a low market capitalization.  Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges.  Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

16.     Wash trades were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership.  For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of Company A through Broker A while simultaneously selling 100 shares at $5.00 per share of Company A through Broker B.  Match trades were similar to wash trades but involved a related third person or party who placed one side of the trade.  For example, a match trade took place when Investor A bought 100 shares at $5.00 per share of Company A through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of Company A through a broker.  Both wash trades and match trades were used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

III.     The Fraudulent Scheme

17.     In or about and between January 2009 and September 2014, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," ANDREW GODFREY, KELVIN LEACH, ROHN KNOWLES, BRIAN DE WIT, CEM CAN, also known as "Jim Can," IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, TITAN INTERNATIONAL SECURITIES INC., LEGACY GLOBAL MARKETS S.A. and UNICORN INTERNATIONAL SECURITIES LLC, together with others, devised and engaged in a scheme whereby they agreed to: (a) defraud investors and potential investors in various U.S. publicly traded companies through, inter alia, fraudulent concealment of their clients' true beneficial ownership interests in the various U.S. publicly traded companies, and the engineering of artificial price movements and trading volume in the stocks of the various U.S. publicly traded companies; (b) defraud the United States by facilitating their clients' efforts

6

to impede, impair, obstruct and defeat the lawful governmental functions of the IRS in the

ascertainment, computation, assessment and collection of revenue, specifically federal income

taxes under, inter alia, FATCA; and (c) launder money by facilitating for their clients financial

transactions to and from the United States, which transactions involved proceeds of fraud in the

sale of securities.

18.     In or about and between January 2009 and September 2014, the defendants

ROBERT BANDFIELD, also known as "Bob Bandfield," ANDREW GODFREY, KELVIN

LEACH, ROHN KNOWLES, BRIAN DE WIT, CEM CAN, also known as "Jim Can," IPC

MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE

SERVICES LLC, TITAN INTERNATIONAL SECURITIES INC., LEGACY GLOBAL

MARKETS S.A. and UNICORN INTERNATIONAL SECURITIES LLC created various bank

accounts through which passed approximately $500 million connected to the defendants' clients,

including more than 100 U.S. citizens and residents.

A.     The Undercover Operation

19.     Beginning in approximately November 2012, a law enforcement agent

posing as a stock promoter engaged in fraudulent trading activity (the "Undercover Agent") was

directed by John Doe 1, an employee for the now-defunct Bahamas-based broker-dealer Gibraltar

Global Securities, Inc. whose identity is known to the Grand Jury, to TITAN and LEGACY.  John

Doe 1 advised the Undercover Agent that TITAN and LEGACY could establish an IBC for the

Undercover Agent to facilitate his stock promotion business, and that same day, sent an email to

the Undercover Agent providing him with the contact information for the defendant KELVIN

LEACH.

20.     In or about January 2013, the Undercover Agent placed consensually-recorded telephone calls to the defendants ANDREW GODFREY and KELVIN LEACH.  During these telephone calls, the Undercover Agent explicitly stated that he was a U.S. citizen who was interested in opening an offshore brokerage account with TITAN.  The Undercover Agent added that he was a stock promoter who wanted to conceal his ownership of stocks and money transfers in order to avoid scrutiny from the SEC and the IRS.  LEACH informed the Undercover Agent that TITAN did not open individual accounts in the name of U.S. citizens but explained that TITAN could open a brokerage account for the Undercover Agent through an IBC that could be created by IPC CORP.  Shortly thereafter, GODFREY informed the Undercover Agent that IPC CORP could establish a corporate structure that concealed the Undercover Agent's ownership interest in his brokerage account at TITAN, which would provide the Undercover Agent with the desired protection he sought from the SEC and the IRS.  Specifically, GODFREY explained that IPC CORP would establish a limited liability company ("LLC") and an IBC for the Undercover Agent and designate IPC CORP's employees as the beneficial owners, or more appropriately, the nominees.  In this fraudulent structure designed to conceal the Undercover Agent's control and ownership, the IBC, which opened the Undercover Agent's brokerage account at TITAN, would be owned by the LLC and the Undercover Agent's name would not be associated with either entity.

21.     In or about October 2013, after the Undercover Agent had paid $3,300 for the IBC and LLC and the brokerage accounts at TITAN and LEGACY established for him by IPC CORP to conceal his true beneficial ownership, the Undercover Agent made consensually-recorded telephone calls to the defendants KELVIN LEACH and BRIAN DE WIT.  During these telephone calls, in furtherance of the Undercover Agent's fraudulent scheme to conceal his true

beneficial ownership of his brokerage account, LEACH and DE WIT confirmed to the

Undercover Agent that IPC CORP had established brokerage accounts, not in his name, but in the

name of the Undercover Agent's designated IBCs.

22.     On or about November 6, 2013, the Undercover Agent met with the

defendants ROBERT BANDFIELD, also known as "Bob Bandfield," and ANDREW GODFREY

at IPC CORP's office in Belize.  The entire meeting was recorded by the Undercover Agent with

a recording device.  During this meeting, BANDFIELD and GODFREY explained, in great detail,

how IPC CORP assisted U.S. citizens, like the Undercover Agent, in evading U.S. laws and

regulations, including the IRS's reporting requirements, by establishing sham IBCs and LLCs.  To

assure the Undercover Agent of IPC CORP's expertise with managing this fraudulent

arrangement and BANDFIELD's own experience in dealing with clients seeking to manipulate

the markets and effectively transfer money and stock into and out of the United States without

leaving a trail, BANDFIELD revealed that he had created TITAN and LEGACY and had

incorporated more than 5,000 sham companies.  BANDFIELD then suggested means by which

the Undercover Agent could circumvent the SEC's reporting requirements by concealing his

beneficial ownership of more than five percent of a public company's stock through nominee

accounts, and the IRS's reporting requirements by having a nominee sign IRS Form W-8BENs for

the Undercover Agent's IBCs and LLCs.  Finally, BANDFIELD and GODFREY explained that

IPC CORP would soon offer its clients prepaid MasterCards that allowed for transfers up to

$50,000 per month, adding, "We can make it so it's not attached to you."

23.     That same day, the Undercover Agent also met with the defendant ROHN

KNOWLES in the presence of the defendant ANDREW GODFREY.  Consistent with the

defendant ROBERT BANDFIELD's explanation of IPC CORP's fraudulent coordination with

9

TITAN and LEGACY, KNOWLES acknowledged that TITAN could not open an account for U.S. citizens, like the Undercover Agent, without IPC CORP's IBC and LLC arrangement. When the Undercover Agent explicitly indicated that he wanted to engage in fraudulent market manipulation through wash trades and match trades between two accounts controlled by him, KNOWLES stated that he could orchestrate those trades through close coordination with the defendant BRIAN DE WIT at LEGACY, and stated that "me and Brian do it all the time for other clients."

24.     A few months later, on or about March 4, 2014, the Undercover Agent met again with the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," and ANDREW GODFREY at IPC CORP's office in Belize. This meeting was also recorded by the Undercover Agent with a recording device. During this meeting, BANDFIELD and GODFREY touted, inter alia, IPC CORP's success in establishing fraudulent corporate structures, including six IBCs and two LLCs for the Undercover Agent in order to conceal the Undercover Agent's true beneficial ownership of the brokerage accounts at TITAN, LEGACY, UNICORN and two additional broker-dealers. BANDFIELD explained that this "slick" structure was specifically designed to counter U.S. President Barack Obama's new laws, a reference to FATCA. BANDFIELD and GODFREY advised the Undercover Agent that the designated nominees, who included a security guard and courier, would sign any stock purchase agreements on behalf of the IBCs at the Undercover Agent's direction. As payment for IPC CORP's services, the Undercover Agent paid BANDFIELD and GODFREY $9,600 in cash and was informed that IPC CORP would refund the earlier $3,300 paid via PayPal to erase the paper trail.

25.     Following this meeting, the defendant ANDREW GODFREY escorted the Undercover Agent to UNICORN's office where GODFREY introduced the Undercover Agent to

the defendant CEM CAN, also known as "Jim Can." GODFREY informed the Undercover Agent

that IPC CORP conducted a lot of business with UNICORN and that UNICORN expedited the

opening of accounts for IPC CORP. After the Undercover Agent explicitly revealed his intentions

to manipulate the stock of a publicly traded company, CAN confirmed that IPC CORP's scheme

of establishing sham IBCs and LLCs enabled UNICORN to execute trades for U.S. citizens like

the Undercover Agent. To further conceal its clients' true beneficial ownership and fraudulent

activities, CAN explained that UNICORN provided its clients with unidentifiable debit cards

which could be used by UNICORN's clients to pay "consultants" in stock manipulation schemes.

CAN also advised the Undercover Agent to keep his wire transfers to Belize under $50,000, and

vary the amounts, because a wire transfer of $50,000 and over caused banks to inquire into the

source of funds.

26.     Following his return from Belize, the Undercover Agent continued

communicating with the defendants ROBERT BANDFIELD, also known as "Bob Bandfield,"

ANDREW GODFREY, KELVIN LEACH, ROHN KNOWLES, BRIAN DE WIT and CEM

CAN, also known as "Jim Can," in furtherance of the Undercover Agent's purported scheme to

conceal his true beneficial ownership, engage in market manipulation of publicly traded

companies, evade reporting requirements and the payment of taxes to the IRS and transfer

proceeds of fraud in the sale of securities to and from the United States. For example, on or about

April 9, 2014, during a consensually-recorded telephone call between LEACH and the

Undercover Agent, LEACH confirmed that any wire transfer requests to TITAN must go through

IPC CORP and that IPC CORP's nominee must execute stock transfers. When the Undercover

Agent explicitly stated that he wanted to orchestrate trading in the stock of a publicly traded

11

company between LEGACY and TITAN, LEACH responded that TITAN worked well with LEGACY.

B.     The Corrupt U.S. Clients

27.     On or about and between March 21, 2014 and May 22, 2014, law enforcement authorities conducted judicially-authorized wiretaps of two IPC CORP, one TITAN and one LEGACY telephone lines, specifically: 305-671-3493 (IPC), 503-305-3897 (IPC), 305-395-7896 (TIS) and 888-400-5461 (LGM).  Additionally, on or about and between May 1, 2014 and May 30, 2014, law enforcement authorities conducted a judicially-authorized wiretap of TITAN telephone line 305-407-8426.  As set forth below, these five judicially-authorized wiretaps (collectively, the "IPC-TIS-LGM Wiretaps") and emails obtained through judicially-authorized search warrants further revealed the fraudulent scheme devised and engaged in, as set forth above, by the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," ANDREW GODFREY, KELVIN LEACH, ROHN KNOWLES, BRIAN DE WIT, CEM CAN, also known as "Jim Can," IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, TITAN INTERNATIONAL SECURITIES INC., LEGACY GLOBAL MARKETS S.A. and UNICORN INTERNATIONAL SECURITIES LLC, and how far the scheme extended beyond the arrangement with the Undercover Agent.

28.     The emails from the search warrants revealed that the defendants were engaged in similar fraudulent schemes to the ones exposed by the undercover operation. Specifically, the emails confirmed that the defendants were assisting a number of U.S. citizens and residents (the "Corrupt U.S. Clients") to evade, inter alia, U.S. securities and tax laws by establishing sham IBCs and LLCs in order to conceal their clients' true beneficial ownership of

12

stocks and funds and engage in market manipulation of U.S. public companies. For example, on

or about September 6, 2013, the defendant BRIAN DE WIT sent an email to the defendant

ANDREW GODFREY requesting that UNICORN waive its account opening fee of $1,000

because "we agreed to open accounts at each others['] firms and we don't charge such a fee . . . ."

On or about November 6, 2013, the defendant ROBERT BANDFIELD, also known as "Bob

Bandfield," sent an email to Corrupt Client 1, an individual whose identity is known to the Grand

Jury, forwarding IRS Form W-8BEN signed by GODFREY as the nominee for the IBC in

response to a request received by Corrupt Client 1 from a U.S. transfer agent. On or about

December 4, 2013, the defendant KELVIN LEACH sent an email to BANDFIELD informing

BANDFIELD that a client requested that $75,000 be wire transferred from a brokerage account to

a law firm in the United States. On or about December 16, 2013, the defendant ROHN

KNOWLES sent an email to BANDFIELD, copying LEACH, in which he forwarded an email

from Corrupt Client 2, an individual whose identity is known to the Grand Jury, requesting six

wire transfers totaling $1.9 million for various IBCs.

      29.    The IPC-TIS-LGM Wiretaps also revealed that the defendants were

engaged in similar fraudulent schemes with Corrupt U.S. Clients to the ones exposed by the

undercover operation and the emails from the search warrants. For example, on or about March

24, 2014, Corrupt Client 3, an individual whose identity is known to the Grand Jury, called the

defendant ANDREW GODFREY, whose name he received from the defendant KELVIN

LEACH, to have IPC CORP establish an IBC for him to enable him to trade through TITAN. On

or about March 26, 2014, Corrupt Client 4, an individual whose identity is known to the Grand

Jury, called GODFREY and stated that his biggest concern was getting his funds wired back into

the United States. In response, GODFREY advised Corrupt Client 4 that he/she could use his/her

IBC account at UNICORN and UNICORN's unidentifiable debit cards to alleviate this concern and get his funds transferred. On or about March 28, 2014, Corrupt Client 5, an individual whose identity is known to the Grand Jury, called the defendant ROHN KNOWLES to inquire about his trading order and wire transfers to a third party. In response, KNOWLES stated that TITAN could execute third-party wire transfers but reminded Corrupt Client 5 that he needed to send the wire instructions through GODFREY or "whoever the signatory is on the account." On or about May 19, 2014, GODFREY called Corrupt Client 6, an individual whose identity is known to the Grand Jury, and stated that IPC CORP's fraudulent scheme using sham IBC and LLC structures was created to evade the IRS, specifically FATCA. On or about May 29, 2014, LEACH called a representative at Cayman National Bank to confirm three wire transfers, including one wire transfer that was requested in the name of an IBC.

30.     The IPC-TIS-LGM Wiretaps also revealed that the defendants were involved in a conspiracy to manipulate the stock of Cannabis-Rx, Inc., a microcap or penny stock company which traded under the ticker symbol CANA. CANA's purported business plan consisted of expanding its business to cater to the real estate needs of the regulated cannabis industry in states where such business was licensed and permitted. CANA's purported business plan also consisted of purchasing real estate assets and leasing facilities to licensed marijuana growers and dispensary owners for their operations.

31.     Specifically, the defendant BRIAN DE WIT was actively involved in the manipulation of CANA's stock. On or about and between March 27, 2014 and April 16, 2014, DE WIT and Corrupt Client 7, an individual whose identity is known to the Grand Jury, engaged in a series of orchestrated transactions which resulted in CANA's stock price plummeting from $13.77 per share on March 27, 2014 to $0.50 per share on April 16, 2014. On March 28, 2014

14

alone, DE WIT received at least five telephone calls from Corrupt Client 7 with specific instructions to fraudulently orchestrate the trading of CANA's stock. That day, CANA's stock, which had not traded since July 2, 2013, had a trading volume of 189,800 shares and the share price plummeted from the previous day's closing price of $13.77 per share to a closing price of $1.90 per share.

COUNT ONE
(Conspiracy to Commit Securities Fraud)

32.    The allegations contained in paragraphs one through thirty-one are realleged and incorporated as though fully set forth in this paragraph.

33.    In or about and between November 2012 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," ANDREW GODFREY, KELVIN LEACH, ROHN KNOWLES, BRIAN DE WIT, CEM CAN, also known as "Jim Can," IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, TITAN INTERNATIONAL SECURITIES INC., LEGACY GLOBAL MARKETS S.A. and UNICORN INTERNATIONAL SECURITIES LLC, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and

15

deceit upon investors and potential investors in various publicly traded companies, in connection with the purchase and sale of investments in the various publicly traded companies, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

34.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," ANDREW GODFREY, KELVIN LEACH, ROHN KNOWLES, BRIAN DE WIT, CEM CAN, also known as "Jim Can," IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, TITAN INTERNATIONAL SECURITIES INC., LEGACY GLOBAL MARKETS S.A. and UNICORN INTERNATIONAL SECURITIES LLC, together with others, committed and caused to be committed, among others, the following:

OVERT ACTS

a.     On or about January 24, 2013, during a telephone call between the Undercover Agent and LEACH, LEACH stated, in part, that the Undercover Agent should contact IPC CORP to establish an IBC.

b.     On or about January 25, 2013, during a telephone call between the Undercover Agent and GODFREY, GODFREY stated, in part, that IPC CORP would set up an LLC and an IBC for the Undercover Agent because the Undercover Agent was an American.

c.     On or about January 25, 2013, GODFREY sent an email to the Undercover Agent providing wire transfer instructions for IPC CORP and a list of IBCs and LLCs from which the Undercover Agent could choose his IBCs and LLCs.

    d.       On or about October 31, 2013, LEACH sent an email to the Undercover Agent confirming receipt of $60,000 from the Undercover Agent via wire transfer to fund the Undercover Agent's IBC brokerage account at TITAN.

    e.       During a meeting on or about November 6, 2013 at IPC CORP's office in Belize City, Belize, between BANDFIELD, GODFREY and the Undercover Agent, BANDFIELD explained that IPC CORP could create an IBC and LLC corporate structure for the Undercover Agent.

    f.       During a meeting on or about November 6, 2013 at TITAN's office in Belize City, Belize, between KNOWLES and the Undercover Agent, KNOWLES confirmed that TITAN and LEGACY executed wash trades and match trades for clients.

    g.       During a meeting on or about March 4, 2014 at UNICORN's office in Belize City, Belize, between CAN, GODFREY and the Undercover Agent, CAN confirmed that IPC CORP's IBC and LLC structure enabled UNICORN to deal with U.S. citizens.

    h.       During a telephone call on or about March 31, 2014 between DE WIT and Corrupt Client 7, DE WIT stated, in reference to trading CANA stock, "I thought I could see Kelvin [LEACH] in there too, so maybe he is in there grabbing some, and together we will try to do what we can."

    i.       On or about March 31, 2014, KNOWLES confirmed in a telephone call with an unidentified individual that KNOWLES had sold 57,100 shares of CANA stock at $1.476 per share.

    j.       During a telephone call on or about April 29, 2014 between BANDFIELD and Corrupt Client 8, an individual whose identity is known to the Grand Jury, BANDFIELD stated, in part, "right now, most of our work is securities, surprisingly enough. We

see a lot of IPOs and lot of penny stock, OTC stock, pink sheets and all that. We trade a lot of it through companies we set up. Probably 99 percent of our business or 98 percent right now is this kind of stock."

(Title 18, United States Code, Sections 371 and 3551 <u>et</u> <u>seq</u>.)

<u>COUNT TWO</u><br>(Conspiracy to Defraud the United States)

35.     The allegations contained in paragraphs one through thirty-one are realleged and incorporated as though fully set forth in this paragraph.

36.     In or about and between November 2012 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," ANDREW GODFREY and CEM CAN, also known as "Jim Can," together with others, did knowingly and willfully conspire to defraud the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment and collection of revenue, specifically, causing the preparation of fraudulent Forms W-8BEN.

37.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," ANDREW GODFREY and CEM CAN, also known as "Jim Can," together with others, committed and caused to be committed, among others, the following:

<u>OVERT ACTS</u>

a.     During a meeting on or about November 6, 2013 at IPC CORP's office in Belize City, Belize, between BANDFIELD, GODFREY and the Undercover Agent,

18

BANDFIELD and GODFREY confirmed that the Undercover Agent would not be subject to the IRS's reporting requirements because IPC CORP's designated nominee would sign the stock purchase agreements and the IRS Form W-8BENs for the Undercover Agent's IBCs and LLCs.

b.      During a meeting on or about March 4, 2014 at UNICORN's office in Belize City, Belize, between CAN, GODFREY and the Undercover Agent, CAN advised the Undercover Agent that having a loan agreement with his IBC would allow him to avoid any issues with U.S. tax regulators.

c.      On or about November 6, 2013, BANDFIELD sent an email to Corrupt Client 1 forwarding an IRS Form W-8BEN signed by GODFREY as the nominee for Corrupt Client 1's IBC.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT THREE
### (Money Laundering Conspiracy)

38.      The allegations contained in paragraphs one through thirty-one are realleged and incorporated as though fully set forth in this paragraph.

39.      In or about and between January 2009 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERT BANDFIELD, also known as "Bob Bandfield," ANDREW GODFREY, KELVIN LEACH, ROHN KNOWLES, BRIAN DE WIT, CEM CAN, also known as "Jim Can," IPC MANAGEMENT SERVICES, LLC, IPC CORPORATE SERVICES INC., IPC CORPORATE SERVICES LLC, TITAN INTERNATIONAL SECURITIES INC., LEGACY GLOBAL MARKETS S.A. and UNICORN INTERNATIONAL SECURITIES LLC, together with others, did knowingly and willfully conspire:

19

a.      to conduct financial transactions affecting interstate commerce, specifically the interstate wire transfer of money and securities, which transactions involved property represented by a person at the direction of, and with the approval of, a federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, specifically, fraud in the sale of securities, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, (i) with the intent to promote the carrying on of such specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(3)(A), (ii) to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(3)(B), and (iii) to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(3)(C); and

b.      to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, (i) with the intent to promote the carrying on of specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(A), (ii) to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i), and (iii) to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(ii).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## FOR COUNT ONE

40.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any property, real or personal, which constitutes or is derived from proceeds traceable such offense.

41.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

　　　　a.     cannot be located upon the exercise of due diligence;

　　　　b.     has been transferred or sold to, or deposited with, a third party;

　　　　c.     has been placed beyond the jurisdiction of the court;

　　　　d.     has been substantially diminished in value; or

　　　　e.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## FOR COUNT THREE

42.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Three, the government will seek forfeiture in

accordance with Title 18, United States Code, Section 982(a)(1), of any property, real or personal, involved in such offense, or any property traceable to such property.

      43.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

      (Title 18, United States Code, Sections 982(a)(1); Title 21, United States Code, Section 853(p))

      A TRUE BILL

_____
FOREPERSON

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK